**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSH PEARSON, JOHN PEARSON, and MARY PEARSON, individually, and on behalf of all others similarly situated, | ) ) ) ) | **Judge:** _____ |
| Plaintiffs, | ) ) | **Magistrate Judge:** _____ |
| vs. | ) ) | **Case No.:** _____ |
| GUITAR CENTER, INC. and NATIONAL ASSOCIATION OF MUSIC MERCHANTS, INC., | ) ) ) | |
| Defendants. | ) ) ) | **JURY TRIAL DEMAND** |

## CLASS ACTION COMPLAINT

NOW COME the Plaintiffs, Josh Pearson, John Pearson and Mary Pearson, ("Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, make the allegations in this Class Action Complaint against Defendants GUITAR CENTER, INC., and NATIONAL ASSOCIATION OF MUSIC MERCHANTS, INC., (concerning their acts and status upon actual knowledge, and concerning all other matters upon information and belief, and the investigation of their counsel:

## JURISDICTION AND VENUE

1.      Plaintiffs Josh Pearson, John Pearson and Mary Pearson bring this action pursuant to §1 of the Sherman Act, 15 U.S.C. §1, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the antitrust injuries sustained by Plaintiffs and members of the Class.

2.      Plaintiffs also seek injunctive relief against Defendants to prevent them from further violations of §1 of the Sherman Act, 15 U.S.C. §1, and pursuant to §16 of the Clayton Act, 15 U.S.C. §26.

3.      Jurisdiction in this Court is proper under 28 U.S.C. §§1331 and 1337, and §§4(a) and 16 of the Clayton Act (15 U.S.C. §§15(a) and 26).

4.      Venue is proper in this Judicial District pursuant to 15 U.S.C. §§15(a) and 22 and 28 U.S.C. §1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found and/or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

5.      This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Music Products throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal price-fixing conspiracy and resale price maintenance scheme that was directed at and had the intended effect of causing injury to persons residing in, located in or doing business throughout the United States, including this District. Further jurisdictional contacts are alleged below.

## INTRODUCTION

6.      Plaintiffs Josh Pearson, John Pearson and Mary Pearson, purchasers of guitars, drum sets, drum sticks, amplifiers, strings and tuners from Defendant Guitar Center, Inc. ("Guitar Center"), bring this action on behalf of themselves and on behalf of a Class consisting of all persons and entities that purchased Fretted Musical Instruments ("Fretted Instruments"), including, but not limited to, acoustic and electric guitars, drum sets, keyboards, mixers, amplifiers or related accessories (referred to hereinafter collectively as "Music Products")

directly from a defendant or a co-conspirator between at least as early as January 1, 1999 and continuing until at least February 1, 2008 (the "Class Period"). Plaintiffs make the allegations in this Complaint on information and belief, except as to the allegations pertaining to Plaintiffs, which are based on personal knowledge.

## NATURE OF ACTION

7. On March 4, 2009, the Federal Trade Commission ("FTC") announced, in a press release entitled *National Association of Music Merchants Settles FTC Charges of Illegally Restraining Competition*, that Defendant National Association of Music Merchants ("NAMM"), an international association representing music products retailers and affiliates, entered into a consent order settling charges that NAMM violated federal antitrust law by enabling and encouraging the exchange of competitively sensitive price information among its members.

8. NAMM's primary objective is to promote the economic interests of its members by increasing consumer demand for musical instruments, lobbying the government, offering seminars, promoting music education, and organizing trade shows. NAMM sponsors two major U.S. trade shows each year where manufacturers introduce new products and meet with dealers. These shows also provide competitors with a chance to meet and discuss issues of concern within the industry.

9. The FTC, during the Commission's investigation, discovered that NAMM organized meetings and programs for its members, including Defendants named in this Complaint, at which "competing" retailers of Music Products were permitted and encouraged to exchange competitively sensitive information, strategies for implementing minimum advertised pricing ("MAP") and other restrictions of retail price competition.

10.     In the late 1990s, NAMM's retail members, including Defendant Guitar Center, saw their profit margins being cut away by new entrants into the Music Products industry.

11.     During the Class Period, Guitar Center, NAMM and NAMM's members conspired, combined and contracted to fix, maintain, stabilize and set minimum agreed-upon resale prices in the Music Products market.

12.     Specifically, in order to protect their market share, NAMM and its retail members entered into an agreement and conspiracy to influence NAMM's manufacturing members to set MAP for Music Products. Because of Guitar Center and other NAMM retail members' purchasing power, the manufacturers had no choice but to accept the imposition of MAP policies.

13.     Soon thereafter, in the late 1990s and early 2000s, manufacturers of Music Products, such as Fender Musical Instruments Corp. ("Fender"), realized MAP policies were an effective means of controlling prices at supracompetitive levels. Manufacturers then became involved in the NAMM-facilitated discussions and came to agreements and were a part of the conspiracy with retail members regarding the anticompetitive MAP policies.

14.     These agreements had the purpose and effect of diminishing and/or eliminating competition on price allowing Guitar Center and other NAMM members to obtain supracompetitive profits and market share.

## PARTIES

15.     Plaintiffs John Pearson and Mary Pearson are Illinois residents living in St. Charles, Illinois. During the Class Period, Plaintiffs purchased a drum set, drum sticks, two (2) amplifiers, guitar picks and other "Music Products" from the Guitar Center located at 996 N. Route 59, Aurora, Illinois 60504.

4

16.     Plaintiff Josh Pearson is a Texas resident living in Austin, Texas. During the Class Period, Plaintiff purchased guitars, guitar strings, amplifiers, foot pedals, cables, and other "Music Products" from Guitar Centers located in Austin, Texas, Aurora, Illinois and Arvada Colorado.

17.     Defendant Guitar Center, Inc. is a Delaware corporation headquartered in Westlake Village, California. Guitar Center is the largest seller of Music Products in the United States with annual sales in 2008 of $1.55 billion in the $7 billion Music Products industry. In 2007, Guitar Center was nearly five times the size of its nearest competitor. From 1997 to 2007, its share of the Music Products industry grew from 6.1% to 26.6%. Guitar Center claims to be the nation's top retailer of guitars, amplifiers, drums, keyboards and pro-audio equipment, and operates more than 210 stores in about 40 states. Guitar Center is the largest customer of many of its suppliers and manufacturers and thus, each manufacturer depends on Guitar Center for a substantial portion of its sales of Music Products.

18.     Defendant National Association of Music Merchants, Inc. is a New York corporation headquartered in Carlsbad, California. NAMM is a trade association composed of more than 9,000 members including manufacturers, distributors and dealers ("dealers" is used interchangeably with "retailers" throughout the Complaint) of musical instruments and related products. Most United States manufacturers, distributors and dealers of musical instruments are members of NAMM. NAMM is controlled by its members, including Guitar Center.  In the United States, NAMM sponsors two major trade shows each year, where manufacturers introduce new products and meet with dealers. NAMM's trade shows provide competitors an opportunity to meet and discuss issues of concern to the industry.

## CO-CONSPIRATORS

19.     Co-Conspirator Fender Musical Instruments Corporation ("Fender") is an Arizona corporation headquartered at 8860 East Chaparral Road, Suite 100, Scottsdale, Arizona. Fender manufactures and sells Fretted Instruments and related accessories, and produces the highest-selling guitar in the United States by a large margin. According to information in a legal brief submitted on behalf of Fender in a recent trademark proceeding, the market share of Fender's three top selling models each year exceeds the market share of the entire product line of most of Fender's largest competitors. Fender is a member of NAMM, and is its largest exhibitor.

20.     Various other persons, firms, corporations and entities have participated with Defendants as unnamed co-conspirators in the violations and conspiracy alleged in this Complaint.  In order to engage in the offenses alleged, these co-conspirators have performed acts and made statements in furtherance of the Defendants' antitrust violations.

## CLASS DEFINITION

*All persons or entities that purchased Music Products in the United States directly from Defendants or Defendants' co-conspirators from January 1, 1999 to February 1, 2008 (the "Class Period").  Excluded from the Class are United States government entities and instrumentalities of the United States government, Defendants, their co-conspirators and their respective parents, subsidiaries and affiliates.*

21.     Plaintiffs do not know the exact size of the proposed Class as that information is in control of the Defendants, but Plaintiffs believe there are at least thousands of Class members located throughout the United States, making the Class so large and geographically diverse that joinder is impracticable.

22.     Defendants' anticompetitive conduct has imposed a common antitrust injury on members of the Class.

23.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, which makes final injunctive relief with respect to the Class as a whole appropriate.

24.     Plaintiffs are members of the Class and Plaintiffs' claims are typical of other members of the Class who likewise sustained antitrust injury and were damaged through Defendants' actions.

25.     Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs purchased Music Products from Defendants and have common and non-antagonistic interest in recovering damages caused by Defendants' anticompetitive conduct and in enjoining and deterring future unlawful activity in the Music Product market.

26.     Plaintiffs have retained counsel experienced in antitrust and other complex class action litigation.

27.     Defendants' anticompetitive conduct has uniformly affected Plaintiffs and members of the Class.  Common questions of law and fact will predominate over individual questions of law and fact.  Among questions of law and fact common to the Class are the following:

    (a)     Whether Defendants and others combined, conspired or contracted to fix or set Music Products prices at artificially high levels;

    (b)     Whether Defendants and others combined, conspired or contracted to impose MAP policies on the industry;

    (c)     The dates and formation of this illegal combination, contract, conspiracy or agreement;

    (d)     The identities of the participants in the illegal combination, contract, conspiracy or agreement;

(e)     The manner and means of the conspiracy;

(f)     Whether, and to what extent, Defendants' conduct violated §1 of the Sherman Act;

(g)     Whether, and to what extent, Defendants and their co-conspirators fraudulently concealed their illegal combination, contract, conspiracy and other antitrust violations;

(h)     whether Class members have suffered injury to their business and property as a result of Defendants' unlawful conduct, including the degree to which prices paid for by the Class for Music Products were higher than those that would have been paid in a market free from illegal combination, contract, conspiracy and other antitrust violations; and

(i)     The appropriateness of injunctive relief to restrain future violations.

28.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class treatment will permit a large number of similarly situated persons and entities to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  Prosecution of separate actions by individual Plaintiffs would create a risk of inconsistent or varying adjudication.  The proposed Class presents no difficulties of management that would preclude its maintenance as a class action.  No superior alternative exists for the fair and efficient adjudication of this controversy.

### INTERSTATE TRADE AND COMMERCE

29.     Defendants and their co-conspirators sell Music Products in the United States.

30.     During all or part of the Class Period, the conduct of Defendants and their co-

8

conspirators has taken place in and/or substantially affected interstate trade and commerce of the United States.

## FACTUAL ALLEGATIONS

**Background**

31.    Most United States manufacturers, distributors and dealers of Music Products are members of NAMM.  As the FTC stated in its complaint against NAMM:

> NAMM serves the economic interests of its members, by *inter alia*, promoting consumer demand for musical instruments, lobbying the government, offering seminars, and organizing trade shows.  In the United States, NAMM sponsors two major trade shows each year, where manufacturers introduce new products and meet with dealers.  In addition, NAMM's trade shows provide competitors an opportunity to meet and discuss issues of concern to the industry.

32.    NAMM's biannual trade shows are considered an indispensable resource by Music Product retailers.  In a February 2007 interview, a member was quoted in *Musical Merchandise Review*:

> Many years ago, the importance of attending a NAMM show may not have seemed important, today it is absolutely necessary.  Owners and key personnel should be at NAMM ... the education seminars are priceless!

> The interaction with the industry people and colleagues is also priceless.

33.    Guitar Center and Fender are NAMM members.

34.    Relative to Guitar Center and most other retail members of NAMM, internet-based retailers are small companies.  Internet retailers of Music Products are highly efficient competitors because, among other reasons, their operating expenses are low.  This allows them to compete vigorously on price, both with other internet retailers and with retailers in other sales channels, such as Guitar Center (which operates through "brick-and-mortar" stores as well as on the internet).  Thus, when allowed to compete freely, internet retailers' price competition enhances consumer welfare by bringing down prices.

35.     In the "virtual roundtable," retailer Frank Hayhurst of Zone Music stated "[t]he internet has blown away selection and price as variables that make an m.i. [music industry] retailer unique, and 'service' doesn't have the terrific 'value added' impact upon the customer that many of us have attributed to it.  If something breaks, they want to know if you'll replace it, not hear about your repair department."

36.     Guitar Center and other large merchants felt the pressure in the form of price competition not only from the internet retailers, but the "big box" and wholesale retailers as well, including stores such as Wal-Mart, Best Buy and Costco.

37.     By the late 1990s, NAMM, Guitar Center and its members recognized that the increased popularity of internet and big box retailers, with the associated increase in price competition, posed a substantial threat to NAMM members' sales and profits.  Thus, NAMM, whose retail members are primarily brick-and-mortar retailers, considered ways to thwart internet retailer competitors.

38.     NAMM's and its members' response to internet retailing was both predictable and anticompetitive.  As recognized at an FTC 2002 public workshop, entitled "Possible Anticompetitive Efforts to Restrict Competition on the Internet," one expert explained:

> *The promise of the world of electronic commerce is to create an environment where consumers can freely shop between various competitive alternatives.  By reducing transaction costs and improving transparency, the Internet offers the potential of dramatically improving competition in various retail markets.*
>
> *             \*       \*       \**
>
> *[But] as new market forces arise, . . . "traditional" competitors often respond to the threat by trying to create barriers to thwart those entrants."*

**During the Class Period, NAMM Provided a Means for Suppliers and Retailers To Control Prices for Music Products in the United States**

39.     Commencing in 1999 and continuing thereafter, numerous leading Music Products manufacturers, in conjunction with and through NAMM, and its dealer members adopted MAP policies.

40.     The purpose of facilitating agreement both as to MAP policies and pricing was because Guitar Center, as well as other retailer members of NAMM, were concerned about increased competition by mass merchants, such as Best Buy, Wal-Mart and Costco, as well as internet retailers.

41.     In the late 1990s or early 2000s, at a NAMM show, "a high-profile retailer delivered a stinging address, lamenting the fact that manufacturers sat by idly as price wars raged and retail profits plummeted."   This address coincided with the adoption of MAP policies by leading Music Product manufacturers, which commenced in 1999 and continued thereafter.

42.     By the early 2000s, several major music retail chains, including Guitar Center, expressed a heightened concern for margin and profit protection.

43.     When NAMM, Guitar Center, and other retail members encouraged and required the implementation of MAP pricing, manufacturers did so for fear of losing Guitar Center as a customer.

44.     In fact, a major shift in retail opinion regarding the effectiveness of MAP policies to protect profits occurred between 2000 and 2001.   A poll conducted by *The Music Trades* magazine ("*Music Trades*") revealed that:

> *Last year [2000] when we polled leading m.i. [music industry] dealers about the value of minimum advertised price (MAP) policies, only 31% said they had a positive effect on gross margins.   60% responded that MAP had no effect at all on selling prices, while 9% said the programs actually decreased margins. When asked the same question this year [2001], retailers expressed a major change of heart.   51% said that MAP policies had improved their gross margins during the past 12 months, and only 44% deemed the policies in ineffectual.*

11

45.     *Music Trades* concluded that the 20-point shift in opinion was due to the fact that "the biggest benefit of MAP policies has been to rid the internet of loss-leader pricing." *Music Trades* explained:

> As a result [of MAP policies], these days when you type the name of a popular product into a search engine, you'll get a screen full of results offering the same MAP regulated price.  As our poll indicates, brick-and-mortar retailers obviously appreciate the fact that they don't have to deal with a legion of customers coming into the store brandishing a computer print out and demanding,  "Why can't you beat this price."

46.     In addition to reducing competition from internet retailers, *Music Trades* also credited MAP policies with a more "sane approach to industry pricing," stating that "retail margins appear to have stabilized."

47.     Accordingly, MAP policies were a hot topic at the January 2001 NAMM trade show.  *Music Trades* reported that retailers' then-current gross margins of 28% to 32% were far lower than they had been in the 1990s, and that both large and small retailers "have jointly concluded that they simply can't afford to give up any more gross margin points."

48.     In response to this joint retailer pressure, at the January 2001 NAMM show, "manufacturers seemed to be doing more than paying lip service to retail profit concerns" by rolling out new and more restrictive MAP policies.  However, the manufacturers acknowledged that the MAP policies were not designed to increase services at the retailers but merely to protect their profit margins.  In fact, manufacturers allegedly "[were] fulsome in their criticisms of the industry's retail network," stating, *inter alia*:  "They don't do any marketing," and "[t]heir stores are staffed with minimum wage idiots."

49.     Thus, the discussion at the January 2001 NAMM show was driven by manufacturers' realization that they could no longer rely on innovative engineering and design.  Instead, to artificially increase profits, manufacturers agreed to implement "[a] distribution scheme that enables retailers to make a respectable gross margin...."

50.     At the January 2002 NAMM show, NAMM continued to facilitate discussion among its members on the use of MAP policies.  As a result, manufacturers "acknowledged the retail concern with profitability by instituting minimum advertised price, or MAP policies.  In fact, mention of MAP pricing was routinely included in just about every new product presentation."

51.     At these shows, NAMM encouraged manufacturers to, and manufacturers agreed to and did, outline their MAP policies.  But the manufacturers did not do so in conjunction with requests for retailer advertising, in-store displays, better product demonstrations or knowledgeable store staff.  Rather, the MAP policies were agreed to at the behest of Defendants and rolled out at the NAMM shows with retailer profitability in mind.

52.     For example, at the summer 2004 NAMM show, "[a] number of exhibitors also announced higher MAP prices in a bid to shore up dealer margins.  As one supplier noted, 'The truth is, there isn't a lot of difference between our products and our competitors.  If we're going to get dealer support, we've got to make these guys money.'"

53.     Similarly, at the NAMM show in summer 2005, manufacturer Peavey Electronics (among others) outlined its MAP policy, reiterating "Peavey's commitment to dealer profitability."

54.     But NAMM did not simply encourage individual manufacturers and dealers to discuss and agree how to restrict price competition.  In fact, it facilitated joint discussions by all members of NAMM.  At NAMM's biannual trade shows and conventions, NAMM hosted "NAMM Show University Sessions."  These sessions were designed to facilitate discussion and education on a wide variety of music industry topics, including price competition and restrictions to competition.

55.     At the January 2006 trade show, NAMM hosted several events regarding MAP policies.

56.     For example, NAMM facilitated a panel discussion regarding MAP policies.  On a panel comprised of industry heavy-hitters, including the Vice President and General Manager of Yamaha's Pro-Audio and Combo division, sales managers from Avedis Zildjian and Kaman Music Corp. and several other retailers, the suppliers were "unanimous, offering a guardedly positive assessment of MAP policies."

57.     At this panel, there was just one lone voice that supported competition on prices. Bryan Junk of www.massmusic.net asked the Panel and the audience, "We're supposed to compete, aren't we?"  According to one industry report of the Panel session:

> *Whether or not you agree with him, Bryan Junk, an internet retailer, deserves credit for staring down an auditorium packed with independent retailers and stating that MAP should be scrapped.  To audible boos, he declared, "Consumers like low prices, and we try to give them what they want.  Why shouldn't we be able to grow our business by offering the lowest prices possible without interference from the manufacturers?"*

58.     However, Mr. Junk's view was not the consensus.  In fact, the panel discussed that, absent MAP, "prices would rapidly migrate down to 10% over cost. . . ."  The panel even advocated revising the current MAP pricing "upwards to give retailers a better profit margin."

59.     The panel also discussed how to enforce the MAP policies, particularly with the proliferation of internet retailers, agreeing that "MAP is only as effective as its enforcement. . . ."

60.     NAMM also released a report based on comments it compiled from January 2006, trade show participants and attendees. NAMM released the following poll results, with answers:

> *What do independent retailers view as a threat to their business and profitability?  On a 1 to 5 scale, with 5 being extremely concerned, rate the following issues. (Report is average of responses.)*

> 3.4     The expanded presence of music products in mass merchants, like Wal-Mart and Costco.

> 3.2     Competition from internet and catalog merchants.

> *           *           *

> 2.5     MAP pricing policies that set margins too low.

14

61.     NAMM hosted another session entitled, "Does The Industry Need A MAP Makeover?" At this session, Music for Everyone ("MFE"), a California retailers association, presented a "voluntary MAP formula/guideline" which it "recommended for general use...."

62.     MFE published and presented at the January 2006 NAMM trade show, with NAMM's participation and consent, the following two pricing formulas based on retail cost which were "designed for all instruments and all combo and audio products":

Proposed MAP Formula
Recommended Minimum Profit Formulas for A & B Discounts

\*     \*     \*

Retail [$1-$149] x 0.5 x 2.00 = MAP (0% off retail)*
Retail [$150-$249] x 0.5 x 1.90 = MAP (5% off retail)*
Retail [$250-$299] x 0.5 x 1.85 = MAP (7.5% off retail)*
Retail [$300-$349] x 0.5 x 1.80 = MAP (10% off retail)**
Retail [$350-$399] x 0.5 x 1.75 = MAP (12.5% off retail)**
Retail [$400-$449] x 0.5 x 1.70 = MAP (15% off retail)*
Retail [$450-$499] x 0.5 x 1.65 = MAP (17.5% off retail)*
Retail [$500 and up] x 0.5 x 1.60 = MAP (20% off retail)*
Retail [$550-$599] x 0.5 x 1.55 = MAP (22.5% off retail)**
Retail [$600 and up] x 0.5 x 1.50 = MAP (25% off retail)**

*Formula A
** Formula B

63.     MFE explained that the formulas were designed to permit "[f]ormula discounts from retail start[ing] at zero" and to provide a "much higher" profit percentage for lower-priced products.

64.     MFE even went so far at the NAMM show to encourage manufacturers to adopt the MAP pricing reflected in Formula A, capping permitted discounts at 20% and stating that Formula A "is likely to be ... accepted widely." Nonetheless, MFE stated that no MAP pricing should be lower than that reflected in Formula B, stating "the formula B profits are the minimum

that brick-and-mortar full service music instrument retailers require to survive, and hopefully thrive."

65.     At the 2006 summer NAMM show, NAMM again held an industry panel discussion, comprised of the NAMM President, a Vice President of Yamaha and the Chairman and CEO of Fender, among others.  NAMM touted this roundtable as follows:  "In the two-hour session suppliers and retailers of all sizes will be able to share views about critical issues affecting profitability, including MAP pricing, Internet sales tax, and the entrance of mass consumer merchandisers into the industry."  Among other topics, MAP prices being set too low and maintenance of profit margins were discussed.

66.     NAMM continued to facilitate industry discussions of MAP pricing at its 2007 winter show.  One roundtable discussion focused on, *inter alia*, increasing profit margins and MAP pricing.

67.     Thus, NAMM again organized meetings and programs for its members at which competing retailers of Music Products, as well as manufacturers of those Music Products, were permitted and encouraged to exchange information and discuss strategies for implementing MAP policies, the restriction of retail competition and the need for higher retailer prices. Representatives of NAMM determined the scope of information exchange and discussion by selecting the moderator and setting the agenda for these programs.

68.     At these NAMM-sponsored events, NAMM members discussed the adoption, implementation and enforcement of MAP policies, the details and workings of such policies, appropriate and optimal retail price and margins and other competitively sensitive issues.

69.     The prevalence of MAP policies in the Music Products industry remained steady into early 2008.  In an article from the February 1, 2008 issue of *Music Trades*, retailer Mike Henry, owner of Percussion Center stated:

> *When products are seen to be "Wal-Mart" cheap, it cheapens the industry.  MAP supports the public's perceived value of the products we're trying to sell competitively and still make a living.  I'm all for competition and the American way, but if retailers can't make a profit, what's the point of being in business.*

Later in the article, Mr. Henry continued:

> *In the long run, a manufacturer that doesn't enforce its MAP isn't going to hurt my business, it's going to hurt their business because I'm going to stop buying from them.  I'm their customer; I'm paying their salaries by buying their products.  If they allow my competitors to sell their product at a price that doesn't give me a reasonable margin, I can't buy it.*

Mr. Henry went on to say that "[a] product's MAP price should be based on its perceived retail price."

70.     In the same article, Fred Bernardo of Fred's Music & Barbecue Supply stated that "[MAP prices] are too low.  They don't allow for the retailer to make an adequate profit.  Also I think MAP is illegal–or at least it was illegal.  It's price fixing, since everyone, especially online, has the exact same 'selling' price on their shopping carts."   Mr. Henry's and Mr. Bernardo's statements underscore the continuing recalcitrant attitude of NAMM retail members, the anticompetitive nature of MAP policies and the stark lack of precompetitive justifications for MAP policies.

**Guitar Center's Dominance and Power in the Industry**

71.     Guitar Center has grown through acquisitions.  In June 1999, Guitar Center bought "Musicians Friend" a leading instrument retailer with a mail order catalog and nine retail stores.  In April 2001, Guitar Center acquired American Music Group and its 12 retail outlets, two mail order catalogs and a musical accessory distributor.  In 2002, Guitar Center acquired M&M Music and Southwestern, retailers of musical instruments to schools.  In mid-2005, Guitar

Center bought Music & Arts Center and it 80 retail locations.  In 2006, Guitar Center acquired four Hermes Music stores in Texas.  In February 2007, Guitar Center acquired the Woodwind and the Brasswind out of bankruptcy.

72.    As of the end of 2008, Guitar Center cornered $1.55 billion of the $7 billion Music Products industry.

73.    Guitar Center is the only national chain and is viewed as dominant in the retail market with 295 stores and the industry's largest mail order operation and sales of $2 billion, Guitar Center is nearly 5 times the size of its nearest competitor by 2007 according to Music Trades.  From 1997 to 2007, its market share has grown from 6.1% to 26.6%.

74.    Guitar Center dwarfs its next largest competitor.  Sam Ash Music Corporation is the number two musical instrument retailer in the United States and operates 45 stores in California, New York, Texas and nine other states.  In 2002, Sam Ash acquired the top nine stores of the Mars Music Chain.

75.    According to independent retailers, Guitar Center wields enormous power in the industry.  In an interview in *Musical Merchandise Review*, April 2007 issue, Alan Levin of Chuck Levin's Washington Music Center said:

> The biggest concern is Guitar Center.  They are many manufacturers' biggest customers and changes are being made...to suit them alone.

76.    One NAMM member observed (as reported in the March 1, 2008 issue of *Music Trades*) "Guitar Center has too much leverage...."

77.    Guitar Center, is, according to its own publicly filed financial reports in 2007, the largest customer of many of its suppliers and thus each manufacturer depends on Guitar Center for substantial portion of its sales of guitars and in Fender's case, among others, for a large share of its profits.

78.     The musical instrument product market is characterized by significant barriers to entry which enhanced Guitar Center's dominance and influence and allowed Defendants to exercise and maintain control over prices of Music Products.

**The FTC Action**

79.     On March 4, 2009, the FTC issued a cease and desist order to NAMM and at the same time settled the FTC's charges that NAMM had "permitted and encouraged" acts constituting violations of Section 5 of the FTC Act among its members and the acts and practices of NAMM "constitute unfair methods of competition in or affecting commerce in violation of Section 5 of the Federal Trade Commission Act, as amended 15 U.S.C. §45." The FTC also alleged that absent appropriate relief "[s]uch acts and practices, or the effects thereof will continue or recur…."

80.     Specifically the FTC, after an investigation, alleged that between 2005 and 2007, NAMM organized various meetings and programs for its members at which competing retailers of Music Products were permitted and encouraged to exchange competitively sensitive information, strategies for implementing minimum advertised pricing and restrictions of retail price competition.

81.     The FTC alleged that the "challenged conduct served no legitimate business purpose and resulted in no significant efficiency benefits."

82.     According to the FTC's press release announcing NAMM's settlement of "FTC Charges of Illegally Restraining Competitions," the FTC's proposed consent order "is designed to remedy NAMM's anticompetitive conduct." The Commission's vote to accept the complaint and the consent order was 4-0.

83.     According to the FTC's complaint, "[a]t these NAMM-sponsored events, competitors discussed the adoption, implementation, and enforcement of minimum advertised price policies; the details and workings of such policies; appropriate and optimal retail prices and margins; and other competitively sensitive issues."

84.     The conduct of Defendants was the cause of supracompetitive price levels for Music Products.  The October 2008 issue of Music Merchandise Review reported that Anthem Music Group's head David Kilkenny observed "[o]ver the past several years instrument prices seem to be increasing at a greater rate than that of inflation ...."  According to the *Music Trades* "Annual Census of the Music Industries" published in 2009, in 2006 the average price of a guitar was $309.00, by 2007 the average price was $350.00 and by 2008 the average price was $372.00.  Thus, Defendants were able to increase aggregate sales from $1,022,861.00 in 2006 to $1,151,290.00 despite a 10% decline in unit sales.

85.     The FTC has alleged that no significant procompetitive benefit was derived from the challenged conduct.  After analyzing the type of information involved, the level of detail, the absence of procedural safeguards and overall market conditions, the FTC concluded that exchange of information engineered by NAMM lacked a procompetitive justification.

86.     The FTC has ordered NAMM to cease and desist from:

(1)     Urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers or Musical Product Dealers relating to:

(a)     the retail price of Musical Products; or

(b)     any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including but not limited to, Price Terms, margins, profits, or

pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies.

(2)     Entering into, adhering to, enforcing, urging, encouraging, advocating, suggesting, assisting or otherwise facilitating any Musical Product Manufacturer or Musical Product Dealer to enter into, adhere to or enforce any combination, conspiracy, agreement or understanding between or among any Musical Product Manufacturers or Musical Product Dealers relating to:

(a)     the retail price of any Musical Product;

(b)     any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies; or

(c)     the refusal to do business, or the reduction of business, with particular Musical Product Manufacturers or Musical Product Dealers.

## DEFENDANTS' ANTITRUST VIOLATIONS

87.     Beginning at least as early as January 1, 1999 and continuing until at least February 1, 2008, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix, maintain and/or stabilize the price for Music Products in the United States.

88.     In formulating and implementing their unlawful contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain and/or stabilize the price of Music Products in the United States.  These activities include the following:

(a)     Defendants participated in meetings and/or communications to discuss the pricing of Music Products;

(b)     Defendants agreed during those meetings and/or communications to force suppliers to charge and/or advertise prices at specified levels and otherwise to increase and/or maintain prices of Music Products in the United States; and

(c)     Defendants then implemented, adhered to and oversaw the agreements they reached.

89.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

90.     During the Class Period, Plaintiffs and members of the Class purchased Music Products from Defendants, their subsidiaries or affiliates, or their co-conspirators at inflated and supracompetitive prices.

91.     As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been injured in their business and property in that they have paid more for Music Products than they would have paid in a competitive market.

92.     The unlawful contract, combination or conspiracy has had the following effects, among others:

(a)     Price competition in the markets for Music Products has been artificially restrained;

(b)     Prices for Music Products sold by Defendants have been raised, fixed, maintained or stabilized at artificially high and supracompetitive prices; and

(c)     Purchasers of Music Products from Defendants have been deprived of the benefits of free and open competition in the markets for Music Products.

22

93.     Defendants' contract, combination or conspiracy constitutes an unreasonable restraint on interstate trade and commerce in violation of §1 of the Sherman Act.

94.     The aforementioned anticompetitive effects of Defendants' conduct on competition in the relevant market outweigh any conceivable procompetitive benefits.

**Relevant Market**

95.     The relevant product market in this case is retail sales of Music Products which includes Fretted Instruments, drum sets, keyboards, mixers, amplifiers and related accessories.

96.     The relevant geographic market in this case is the United States of America.

97.     By virtue of their power to control prices and exclude competition in the relevant market, Defendants at all relevant times possessed market power in the relevant market. Moreover, at all relevant times Defendants possessed dominant shares of the market for retail sales of Music Products.

98.     Likewise, Defendants at all relevant times possessed substantial power in the market for Music Products.  Specifically, Defendants:  (a) sold their musical instruments and assorted accessories at prices substantially in excess of marginal costs; (b) enjoyed high profit margins thereon; and (c) sold such products substantially in excess of the competitive price.

99.     Defendants exchanged competitively sensitive information that had the purpose, tendency and capacity to facilitate price coordination among competitors.

100.    There is substantial concentration among the firms that manufacture the products in the relevant market.

101.    Defendants together imposed and enforced minimum retail price maintenance and MAP policies which were contrary to manufacturers' economic interests because each

manufacturers' rational economic goal was to increase sales volume rather than terminate retailers.

**Market Effects of Defendants' Conduct**

102.   The overall effect of Defendants' anticompetitive, exclusive scheme has been to substantially foreclose and impair competition (and the threat of such competition) from lower-priced Music Products.  As alleged above, had Defendants not improperly foreclosed or stifled actual or potential competitors from competing in markets for Music Products, other actual or potential rival manufacturers would have achieved much greater sales than they actually did (or threatened to do), given the cheaper prices that they charged (or could have charged upon entry), and would have posed a far greater competitive threat to Defendants.  As a result, absent Defendants' misconduct, Defendants would have rationally perceived that there was a greater threat of potential competition in each of the relevant markets if Defendants did not reduce their supracompetitive prices.

103.   The presence of unfettered competition from actual or potential competitors, which were selling lower-priced Music Products, would have forced Defendants to lower the prices for their Music Products in order to remain competitive and/or counter a perceived threat of additional entry.

104.   As a result of Defendants' conduct, independent retailers could not compete with nationwide and/or multiregional claims because the retailers could not price-compete. Accordingly, retailers such as Guitar Center were able to raise prices above and beyond what they would be under competitive conditions.

105.   During the Class Period, Plaintiffs and other members of the Class purchased Music Products directly from Defendants.  As a result of Defendants' alleged illegal conduct,

members of the Class were compelled to pay, and did pay, artificially inflated prices for the Music Products they purchased.  Plaintiffs would have been able to, *inter alia*, purchase less-expensive Music Products had potential competitors been able to engage in unfettered competition.  The prices that Plaintiffs and the other Class members paid for Music Products during the Class Period were substantially greater than the prices that Plaintiffs and the Class members would have paid absent the illegal conduct alleged herein because:  (1) the prices of all Music Products were artificially inflated by Defendants' illegal conduct; and (2) Class members were deprived of the opportunity to purchase Music Products at substantially lower prices.  Thus, Plaintiffs and the Class have, as a consequence, sustained substantial damages in the form of overcharges.

**Anticompetitive Effects of Defendants' Unlawful Conduct**

106.   The MAP policies imposed and enforced by Defendants here went well beyond typical cooperative advertising programs where manufacturers place restraints on the prices dealers may advertise in advertisements funded in whole or in part by the manufacturer.

107.   The MAP policies imposed on manufacturers by music retailers and NAMM are anticompetitive.  According to a *Wall Street Journal* article dated October 23, 2008, Bradley Reed, sales manager for Musician's Advocate, Inc. said "it [his company] has very little choice but to honor manufacturers' policies on advertised prices because otherwise it risks having its supplies cut off or being delisted as an authorized distributor."

108.   In large part, NAMM's concerted efforts were successful. Despite the fact that NAMM and its members expressed their fear at the January 2001 NAMM trade show that the then-current gross margins of 28% to 32% would be chipped away even further by price competition, a *Music Trades* report published in 2008 provided that the music industry

maintained large gross margins of 30% versus approximately 22% gross margins for the traditionally high-margin consumer electronics industry.

109.   Defendants' conduct caused actual antitrust damage to purchasers of Music Products in the form of higher prices and diminished price competition.

110.   The aforementioned anticompetitive effects of Defendants' conduct on competition in the relevant market outweigh any conceivable procompetitive benefits.

**FRAUDULENT CONCEALMENT IN FURTHERANCE OF THE CONSPIRACY**

111.   Plaintiffs had no knowledge of the anticompetitive conduct alleged in this Complaint, or of any facts that might have led to its discovery in the exercise of reasonable diligence, prior to the FTC's March 2009 press release detailing the consent order that it entered into with Defendant NAMM.

112.   Defendants and their co-conspirators employed deceptive practices to conceal their conspiracy.

113.   As a result of Defendants' fraudulent concealment of the conspiracy, Plaintiffs assert the tolling of the applicable statute of limitations affecting the causes of action by Plaintiffs and the members of the Class.

## COUNT I

## VIOLATION OF §1 OF THE SHERMAN ACT

114.   Plaintiffs incorporate and reallege each allegation set forth in the preceding paragraphs of this Complaint.

115.   Beginning at least as early as January 1, 1999 and continuing to February 1, 2008, Defendants and their co-conspirators, by and through their officers, directors, employees, agents or other representatives, entered into a continuing agreement, understanding and conspiracy in

restraint of trade to artificially raise, fix, maintain and/or stabilize prices for Music Products in the United States in violation of §1 of the Sherman Act, 15 U.S.C. §1.

116.   Defendants' unlawful conduct resulted in artificially high prices charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Music Products.

117.   As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have paid, and continue to pay, more for Music Products than they would have paid in a competitive marketplace.

118.   Plaintiffs seek to recover for these overcharge damages.

119.   As a direct and proximate result of Defendants' scheme, Plaintiffs and members of the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined.   Plaintiffs' injuries consist of paying higher prices to purchase Music Products than he would have paid absent Defendants' conduct. Plaintiffs' injuries are the type the antitrust laws were designed to prevent and flow from Defendants' unlawful conduct.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of all members of the Class, prays for a judgment that:

A.   The Court certify the Class pursuant to Federal Rule of Civil Procedure 23(b);

B.   The Court find that the combination and conspiracy and other illegal activities alleged in this Complaint be adjudicated a *per se* violation of, or alternatively, a rule of reason violation of §1 of the Sherman Act, 15 U.S.C. §1;

27

        C.      Plaintiffs and the Class recover damages against each Defendant, jointly and severally, in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15;

        D.      Plaintiffs and the Class be awarded their expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law;

        E.      This Court permanently enjoin unlawful activity by Defendants in violation of the antitrust laws; and

        F.      Plaintiffs and the Class be awarded such additional relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.


Dated: <u>October 30, 2009</u>               Respectfully submitted,

                              By: <u>/s/ Robert M. Foote</u>
                                Robert M. Foote, Esq.

                                Robert M. Foote, Esq. (#03124325)
                                Matthew J. Herman, Esq. (#06237297)
                                FOOTE, MEYERS, MIELKE & FLOWERS, LLC
                                3 North Second Street
                                Suite 300
                                St. Charles, Illinois 60174
                                Telephone: (630) 232-6333
                                Facsimile (630) 845-8982

                                Kathleen C. Chavez, Esq. (#06255735)
                                  Chavez Law Firm, P.C.
                                3 North Second Street
                                Suite 300
                                  St. Charles, Illinois 60174
                                Telephone: (630) 232-4480
                                Facsimile (630) 845-8982

Peter L. Currie, Esq. (#06281711)
The Law Firm of Peter L. Currie, P.C.
536 Wing Lane
St. Charles, Illinois 60174
Telephone: (630) 862-1130
Facsimile: (630) 845-8982

***Attorneys for Plaintiffs***